No. 38,718

LAUGHLIN MOTORS, a Co-Partnership composed of D. W. LAUGHLIN and G. W. HAMILTON, *Appellees,* v. UNIVERSAL C. I. T. CREDIT CORPORATION, a Corporation, *Appellant.*

(251 P. 2d 257)

Opinion filed December 6, 1952.

*Vincent F. Hiebsch,* of Wichita, argued the cause, and *Milton Zacharias, Kenneth H. Hiebsch, J. R. Sheedy, Yale W. Gifford,* and *Richard A. Render,* all of Wichita, were with him on the briefs for the appellant.

*Donald Hickman,* of Arkansas City, argued the cause, and *Al T. Singletary,* of Perry, Oklahoma, and *Kirke W. Dale,* of Arkansas City, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: Plaintiffs sued to recover the price of a Mercury automobile which they alleged they owned and contracted to sell for cash to the Don Hanna Motor Company, hereinafter called Hanna, which took the car with the understanding that the cash price would be paid promptly; that the cash was not paid; that defendant was financing Hanna and took over its business, received the proceeds from the sale of the Mercury automobile and converted the same to its own use, with knowledge of the facts. There was a second count for punitive damages. The jury answered special questions and returned a general verdict for plaintiffs on both counts. The trial court approved the verdict and rendered judgment thereon. Defendant has appealed.

The primary question involved is whether plaintiffs had title to the car at the time of the alleged conversion. The secondary questions are (1) whether the proceeds of the car were properly traced to defendant and (2) whether plaintiffs are entitled to punitive damages.

The pertinent facts, not seriously controverted, may be stated as follows: The plaintiffs, D. W. Laughlin and G. W. Hamilton, partners, were doing business as Laughlin Motors at Stillwater, Okla. They had the agency for the sale of new Mercury automobiles. The Don Hanna Motor Company was doing a motor car business at 118 South A Street, Arkansas City, Kan. At various times prior to November 25, 1950, when Hanna would get a purchaser for a Mercury automobile he would contact plaintiffs and get the car his customer wanted from plaintiffs for cost plus a small handling charge, on payment of cash. Six such sales were made by plaintiffs to Hanna. On November 25, 1950, Hanna called Mr. Laughlin, one of the plaintiffs, and asked if plaintiffs had a certain brand of Mercury car. Laughlin said they did and that Hanna could have it for cash, and to bring the cash with him. On November 29 Hanna sent one of his employees, Dale Foust, to plaintiffs' place of business for the Mercury car. Asked to state the conversation between them Mr. Hamilton replied:

"When Mr. Foust came after the automobile I talked to him, and during the course of our conversation I asked him where the check was for this automobile. He said he didn't have a check, that he hadn't been given any; that he had just left Mr. Hanna at Oklahoma City, and that he instructed him to come by Stillwater and pick up this automobile. . . . I told him at that

time it was supposed to be a cash deal, and that he should have a check with him for the car. Of course, we talked further. I said, since you are right here you might as well go ahead and take the car but be sure when you get back to Arkansas City that you talk to the bookkeeper and have them mail us a check immediately. Then he said, well, I am leaving my car—(he was in a used one at the time). He said that someone would come to pick it up. I said, in that event you might let the boy bring the check that brings the car, just so long as it is paid for and we want the check immediately."

Mr. Hamilton gave Mr. Foust an invoice dated 11-29-50 which recited Laughlin Motors sold to Hanna a Mercury, described by the year, model and motor number, stated a cash price of $1,964.91, and the words "cash on delivery." He was told to advise Mr. Hanna that he must have the check. No bill of sale or other instrument transferring title was given to Foust. Hamilton told him that he could take the car but that Laughlin Motors would retain the title. The next day Hanna's representative came to pick up the automobile Foust was driving the day before. He had no check. He was told to tell Hanna he must have the check. Following the delivery of the Mercury to Foust there were repeated promises by Hanna to pay for the car, but payment was not received. On December 6 Mr. Hamilton went to Hanna's place of business in Arkansas City to get the money for the car. Mr. Hamilton did discover that the Mercury had been sold to Mr. Earl Owens, who had traded in a Studebaker car on the purchase and paid $1,377 in cash; that the Studebaker car had been sold to someone for $475 and a Nash automobile, which had been mortgaged by Hanna to defendant. Under the facts above stated defendant had pleaded and contended through the trial, and contends here, that the title to the car had passed from plaintiffs to the Don Hanna Motor Company by reason of a statute of Oklahoma, Section 318, Title 60, which reads:

"Conditional sale must be recorded. Any instrument in writing, or promissory note, evidencing the conditional sale of personal property, which retains the title to the same in the vendor until the purchase price is paid in full, shall be void as against innocent purchasers, or the creditors of the vendee, unless the original instrument, or a true copy thereof, shall have been deposited in the office of the register of deeds in and for the county wherein the property shall be kept; and when so deposited, it shall be subject to the law applicable to the filing of chattel mortgages; and any conditional, verbal sale of personal property, reserving to the vendor any title in the property sold shall be void as to creditors and innocent purchasers for value. R. L., 1910, Sec. 6745."

Defendant stresses this section, as interpreted by the Oklahoma supreme court in the case of *Tague v. Guaranty State Bank of Drum-*

*right*, reported in 82 Okla. 197, 202 Pac. 510. In that case one Cowles sued the Logan Oil & Gas Co. for the enforcement of a labor lien. The Guaranty State Bank filed an interplea seeking to foreclose a chattel mortgage executed by the oil company to it and covering certain oil pipe of the value of $3,713. Thereafter Charles L. Tague filed an interplea in which he claimed the property described in the bank's mortgage, alleging it had been turned over to the oil company under a sale to them in writing, a copy of which was attached to the interplea. This set out the sale of certain pipe to the oil company for $8,000, the company having executed notes to Tague for the consideration of $8,000 less $500 paid in cash. It was alleged the notes had been delivered to Tague, who had executed a bill of sale and delivered the same to the oil company, and also delivered the pipe to the oil company. It was further alleged that the title to the pipe was to remain in Tague until the full purchase price, evidenced by the notes, was paid, and alleged that the bank had actual knowledge of the contract. This contract had not been recorded as required by the statute. Later Tague filed an amended interplea in which he sought to plead an oral contract between him and the oil company whereby it was agreed that title to the pipe should not pass to the oil company until the purchase price was fully paid, and alleged that Tague let the oil company have the property under a bailment; that the contract was not a contract of sale but merely an executory contract of sale. The bank joined issues on Tague's interplea. The trial court held the transaction to be a conditional sale as distinguished from a sale on condition or an executory agreement for sale. Tague appealed. In the supreme court the parties agreed the pivotal question in the case was whether the transaction alleged by Tague amounted to a conditional sale or a sale on condition. With respect to that the supreme court said:

"The distinction between these two kinds of contracts as to the sale of personal property is a very narrow one. It appears, however, that under the laws of this state the distinction is recognized. The following Oklahoma cases discuss this distinction: *Garrison v. Latham*, 23 Okla. 599, 103 Pac. 609; *Carpenter v. Mead*, 60 Okla. 127, 153 Pac. 658; *Brooks v. Tyner, et al.*, 38 Okla. 271, 132 Pac. 683; *Oklahoma Moline Plow Co. v. Smith*, 41 Okla. 498, 139 Pac. 285; *U. S. Supply Co. v. Andrews*, 71 Oklahoma [293], 176 Pac. 967.

"The distinction between a conditional sale and a sale upon condition, or an executory contract of sale, is that in the conditional sale the title to the property and the right to possession passes to the vendee at the time of the transaction. Even though it may specify that the title is reserved in the vendor, and is upon condition that the title does not pass until the agreed purchase price

is paid, the same constitutes a conditional sale; and in the event that the purchase money is not paid, as between the vendor and vendee, the vendor can reclaim the property and title will revest in the vendor; and in its nature it is what is sometimes in the law of real property called a fee conditional, and the condition not being complied with, title revests in the seller.

"In an executory contract of sale, or a sale upon a condition, the title does not vest at the time of the transaction, but only vests upon the happening of a future condition, and the vendee, in that case, does not hold the title of the property, but if in possession, his holding is similar to a bailment, lease or rental. Such last described contracts do not have to be placed of record in compliance with section 6745, Rev. Laws 1910, and hereinafter quoted, in order to protect the vendor."

This doctrine was recognized and applied in the following Oklahoma cases, citing the Tague case: *Western Rope & Mfg. Co. v. Overland Petroleum Co.*, 98 Okla. 5, 223 Pac. 659; *National Cash Register Co. v. Stockyards Cash Market*, 100 Okla. 150, 228 Pac. 778, 780; *Yonkman v. Harvey*, 133 Okla. 252, 271 Pac. 839, 841; *Phelan v. Stock Yards Bank*, 134 Okla. 13, 276 Pac. 175, 177.

The rules of law laid down in the Tague case are neither new, as evidenced by the earlier authorities cited therein, nor are they limited to Oklahoma. It is really a part of the doctrine of when title passes upon the sale of personal property. In 46 Am. Jur. 584, treating of that question, it is said:

"There is a material distinction between an executed and an executory contract of sale in respect of the passing of title to the property from the seller to the buyer. In the case of an executed contract of sale, the title passes, ordinarily, at the time of the transaction, . . . In the case of an executory contract of sale, the title does not pass, ordinarily, until the consumption of the transaction by performance of the terms and conditions of the contract to sell. Stated affirmatively, the title passes to the buyer when the contract becomes executed, in the absence of any intention to the contrary. The contract is said to be executory when there remains something to be done the performance of which is a condition precedent to the transfer of the property, . . ."

And on the next page there is a discussion to the effect that the intention of the parties is controlling.

In 77 C. J. S. 1031, the rule is thus stated:

"Ordinarily under a completed or executed contract of sale the property in the goods passes at once from the seller to the buyer. Under an executory contract of sale title does not pass to the buyer as against the seller or persons claiming under him as long as the contract remains executory."

And it appears to be the universal rule that when personal property is sold for cash the title to the property does not pass to the buyer until payment is made, even though the property has been delivered.

In *Bank v. Brown,* 80 Kan. 520, 103 Pac. 102, it was held:

"When a bargain is completed for the sale of specific personal property for cash, and delivery is made, if the buyer fails to pay the price promptly the seller has a right as between the parties or against an attaching creditor to reclaim the property, which is not lost by delay to assert it, unless an intention on his part is shown that the title should pass absolutely; and whether that is the case is ordinarily a question of fact to be determined in view of all the circumstances."

And in *Harbert v. Fort Smith Canning Co.,* 134 Kan. 240, 5 P. 2d 849, it was held:

"Where a seller contracts with a buyer to sell him certain goods for cash, and a delivery of the goods is made pursuant thereto and simultaneously with the delivery a check for the purchase price is handed the seller, payment of which check is refused at the bank on account of lack of funds, there was no payment, and seller may replevin his goods from buyer."

And it was further held in such a case:

"Goods were sold to buyer for cash. Delivery was made. A check was given in payment. Payment of the check was refused at the bank. At the time goods were delivered to buyer he directed delivery of them to a third party. Third party paid buyer by giving him credit on preexisting indebtedness. *Held,* that buyer took no title, that third party was not an innocent purchaser and took no title and that seller could replevin his goods from third party."

In 78 C. J. S. 29, dealing with the recovery of goods or their proceeds the general rule is thus stated:

"The right of an unpaid seller to recover the goods presupposes that possession of the goods is in the buyer or a third person, but that title to the goods either remains or revests in the seller."

In 77 C. J. S. 1028, the rule is thus stated:

"As a general rule, whether or not title to goods or personalty has passed to the buyer, and, if so, when, depend primarily on the intention of the parties."

And at page 1029 the rule is thus stated:

"The language and terms of the contract of sale are to be considered in determining the intention of the parties as to the passage of title and the time thereof."

In *Kennedy v. Glen Cove Mut. Ins. Co.,* 154 Kan. 327, 118 P. 2d 591, it was held:

"In a sale of personal property the fundamental rule of construction to be applied, in determining whether title had passed, is the intent of the parties.

"When uncertainty results from language employed in a written or oral contract of sale, courts, in order to determine the intent of the parties, may consider legitimate circumstances surrounding the sale, including the acts and conduct of the parties and the construction placed upon the contract by the parties themselves."

In this case the court did submit the question to the jury under instructions set out in the counter abstract, which appear to be proper, although all of the instructions have not been brought to this court. The general verdict for plaintiffs resolved that question in their favor. We see no reason for disturbing it.

The general verdicts read:

"We the jury, impaneled and sworn in the above entitled case, do upon our oath, find for the plaintiff on its first cause of action and assess the amount of its recovery at $1,964.91.

"We find for the plaintiff on its second cause of action and assess the amount of damages of $500.00."

The special questions and answers thereto read:

"1. On what date was the letter bearing date of December 2, 1950, signed by the defendant and the Don Hanna Motor Company? Answer: November 30, 1950.

"2. On what date did Mr. Steele first arrive in Arkansas City to represent the defendant Company? Answer: December 2, 1950.

"3. Was the defendant advised prior to the signing of the mortgage on the 1948 Studebaker that it was to be traded in on the Mercury in the deal between the plaintiff and the Don Hanna Motor Company? Answer: Yes.

"4. Did any representative of the defendant tell Mrs. Craig not to make any payment to the plaintiff on their auto? Answer: Yes.

"5. If you answer question No. 4 in the affirmative, state the date such instruction was first given. Answer: December 2, 1950.

"6. If you find for the plaintiff and against the defendant, state:

"(a) The different amounts each check or sum of money received by the defendant? Answer: $710 $475 $862.50.

"(b) The approximate dates when each sum was taken? Answer: December 1, 1950, approximately 4th of December. Approximately December 4, 1950.

"(c) Each automobile so taken by the defendant? Answer: 1946 Nash.

"(d) The approximate value of each such automobile? Answer: $862.50."

Sometime after the submission of the case to the jury the record discloses the following:

"The jury returns to the court after deliberating and announce that they have agreed upon a verdict.

"The clerk of the court reads the verdict and answers to special interrogatories.

"Court: Any questions by anyone?

"By the Court: There being no objections the verdict and answers are received and filed."

Within three days defendant filed a motion for a new trial upon the following grounds:

"Because of (1) abuse of discretion of the Court, misconduct and surprise which ordinary prudence could not have guarded against, whereby this De-

fendant was not afforded a reasonable opportunity to present its evidence and be heard on the merits of the case. (2) Because of erroneous rulings and instructions of the Court. (3) Because the verdict was given under the influence of passion and prejudice. (4) Because the verdict is in whole and in part contrary to the evidence, and (5) Because of newly discovered evidence material to this Defendant which it could not with reasonable diligence have discovered and produced at the trial."

On the same date defendant filed a motion asking the court to set "aside the verdict rendered in this case and for judgment notwithstanding the verdict for the reason that this Defendant is entitled to judgment under the pleadings and evidence offered in this case."

At the hearing of the motion for a new trial one of the attorneys for defendant filed his affidavit stating what certain witnesses for the defendant would have testified to upon the trial if questions asked them had not been objected thereto and the objections sustained. After hearing counsel for both sides the court found:

". . . that the defendant has not shown itself entitled to a new trial upon any of the grounds alleged in its motion therefor and has not shown itself entitled to judgment setting aside the verdict and notwithstanding the verdict; . . ."

Both motions were denied and judgment was rendered for plaintiffs for $1,964.91 on its first cause of action and for $500 upon its second cause of action. In due time defendant appealed to this court.

In this court appellant argues several questions which will be discussed in order. First, it is contended that the court erred in admitting the telephone conversation testified to by Laughlin to have been had with Hanna on November 25 in which Laughlin testified that Hanna asked him if he had a certain make of automobile and Laughlin told him he did, and that Hanna could have it for cash. Appellant contends this conversation was purely hearsay and should not have been admitted over defendant's objection. The point is not well taken. The conversation may very well be regarded as a preliminary matter, as ruled in *Bailey v. McLeod,* 143 Kan. 638, 56 P. 2d 460. There is written evidence that the sale was for cash, as shown by the invoice which gave the price and stated, "cash on delivery." Hanna understood it was a cash sale. This is shown by the testimony of Mrs. Craig, who also testified that she advised defendant's representative that it had been purchased for cash and that a check should be sent to plaintiffs in payment.

Appellant contends that the court erred in refusing to admit Exhibit 6. This was in the form of a letter written by Hanna to defendant as to how the business would be handled after defendant's representative found that the Hanna business was not being properly handled. It bore the date of December 2, 1950. The witness Craig testified that date was incorrect, that the correct date was November 30. • The jury in answering special question No. 1 found the date should have been November 30. The exhibit was one which plaintiffs never saw or had anything to do with. The court admitted the exhibit in evidence only as it went to the credibility of the witness Craig. We think the ruling was proper.

It was further contended that the court erred in refusing to admit proffered competent testimony contained in defendant's motion for a new trial. At the trial defendant's witness, W. H. Steele, and its witness, E. G. Shively, were asked certain questions, which were objected to by plaintiffs, and the objections were sustained. Neither of those witnesses made any affidavit to be used on the motion for a new trial. There was an affidavit made by one of the attorneys for defendant. This has been held to be not in conformity to our statute. (G. S. 1949, 60-3004; *Beymer v. St. Paul Fire & Marine Ins. Co.*, 128 Kan. 172, 173, 276 Pac. 833.) It is the testimony of the witness that is required to be shown on the motion for a new trial—not a statement by the attorney of what the witness would have testified to had he been permitted to answer the question.

Defendant also offered Exhibit 2, which was a chattel mortgage given by Hanna to defendant, dated November 28, 1950, on certain automobiles; also Exhibit 4, which is a chattel mortgage covering a number of automobiles of the date of November 25 and duly recorded with the register of deeds on November 29. These were transactions between Hanna and defendant of which the plaintiffs knew nothing. They were admitted in evidence only for the purpose of affecting the credibility of the witness Craig. Neither of these mortgages covers the Mercury automobile involved in this action. Defendant concedes it never did have a mortgage on that automobile.

Appellant contends it was prejudiced by remarks made by the court addressed to defendant's counsel. We have examined all of these. We find no reversible error therein. One of them, more serious, obviously resulted from a misunderstanding between the court and counsel as to what witness was being referred to. The

other remarks complained of refer to colloquy between the court and counsel arising because of counsel's repeated efforts to introduce evidence as to controversies between defendant and Hanna of which the plaintiffs knew nothing and with which they were not concerned, the court insisting on trying the case between the parties in court. We see nothing seriously objectionable to the language of the court in that particular.

Appellant contends the court erred in refusing to give the instructions requested by appellant. Defendant requested three instructions. These were not given in the language requested. The same subject matter, however, was covered by the court's instructions. We think the instructions requested were too favorable to defendant and that the instructions given properly covered the subject. The record does not show any objection to the instructions given.

It is argued the court erred in not administering the oath to the bailiff, as provided by law, when the jury retired to deliberate. It may be conceded that the oath should have been given for the reason that the statute (G. S. 1949, 20-312) requires it. But in this case there is no showing of any injury resulting from not giving the oath, and under the authority of State v. Crilly, 69 Kan. 802, 77 Pac. 701, the failure to do so is not reversible error.

Appellant contends the court erred in refusing to set aside the verdict and to render judgment for defendant for the reason, (a) that no proper cause of action was stated either in the first or second causes of action. On this point counsel argue the motion to strike certain portions of the petition should have been sustained for the reason they did not constitute a clear and concise statement of facts upon which plaintiffs relied, and that the statements were mere conclusions of law. We have examined this question and conclude that the parts of the petition which defendant contends should have been stricken were not seriously objectionable. All of them pertain to plaintiffs' first cause of action.

While there was controverted testimony pertaining to some of the questions asked the jury there is ample evidence to sustain the answers given. It is clear from the evidence that plaintiffs recovered nothing from the sale of the Mercury car in question to Hanna and that defendant received all the proceeds of the sale of that car. When the Mercury car in question was sold to a Mr. Owens he turned in a Studebaker for part payment and gave his check for $1,377. When the Studebaker was sold the purchaser paid $475 in

cash and turned in a Nash automobile. The Nash car was taken possession of by defendant. The jury found the value of that to be $862.50. Of the three amounts, $710, $475 and $862.50, found by the jury in answering special question No. 6 (*a*), there is no controversy about the last two. As to the $710 item, it was stipulated "that the check for $710 dated December 1, 1950, plaintiffs' Exhibit 4, was paid to Universal C. I. T. Credit Corporation and that Exhibit 5, for $475 was paid by Don Hanna to C. I. T. when the 1948 Studebaker was sold." This $710 was a payment due defendant on a chattel mortgage on a Ford automobile sold prior to that time without the mortgage being paid. In other words, it was paid for a past due debt which Hanna owed defendant. On December 1, 1950, the date of that transaction, the Hanna bank account showed two deposits made on that date, one for $932.21 and the other for $1,377. It was argued on behalf of appellant that it cannot be told from the bank record from which one of those deposits the $710 check was taken. Mrs. Craig testified it was paid out of the $1,377 deposit. If there was any controversy over that the jury decided it in answering question No. 6 (*a*).

We turn now to the verdict of $500 for punitive damages returned under the second cause of action. In this court counsel for appellant contend that its demurrer to that cause of action should have been sustained and that the evidence did not support a verdict of punitive damages. Passing the question of whether the demurrer should have been sustained to that cause of action, and examining the evidence, we think it did not justify an award of punitive damages. This requires an examination of defendant's relations to Hanna and the circumstances it found itself in when it learned that plaintiffs claimed the Mercury car to have been sold to Hanna on a cash basis and that the cash had not been paid. Under date of August 15, 1950, Don Hanna and Earlene Barton (between that date and the trial she was married and her surname now is Craig), as partners, made a financial statement to defendant for the purpose of having defendant finance them in an automobile business at Arkansas City which showed a total net worth of $85,000. Mrs. Craig testified that she put $3,000 in the business; that she went with Hanna about October 10 or 15 as a bookkeeper, having had five and one-half years' experience with another automobile concern in that capacity, and was familiar with the motor car business and dealership; that she and Mr. Hanna were the only persons authorized to draw checks. She kept the books, issued checks, collected money,

wrote receipts and kept all of the records of the Hanna business. Under date of November 25, 1950, she executed a mortgage to defendant covering a number of automobiles, as a result of which defendant delivered a sight draft to Hanna for $8,635. Mr. Shively, defendant's branch manager at Wichita, contacted Hanna on November 21, at which time he discovered that the business was not being handled properly. He was at Hanna's place of business on November 27 and 28 together with Mr. Steele, a representative of defendant, and defendant's attorney. On November 28 Mrs. Craig executed another mortgage to defendant covering three automobiles. On that occasion defendant's representatives learned that Hanna sold cars on which defendant had mortgages without remitting to defendant, had mortgaged some cars more than once, and that the mortgages given had included cars not owned by Hanna.

On that occasion, or within a few days after, there was a written agreement between defendant and Hanna with respect to how the business should be handled. This included authority of defendant to leave one of its representatives with Hanna to assist and look after the business. This was in the form of a letter addressed to defendant and signed both by Don Hanna and Earlene Barton and accepted in writing by E. G. Shively, representing defendant. There is some conflict in the testimony as to the dates certain of these things were done, but in considering the question of punitive damages the specific date is not important. Defendant's representative, W. H. Steele, was left with Hanna. Mrs. Craig testified:

"That she told Mr. Steele when he was servicing the Mercury that it came from another dealer, Laughlin Motors, and she had to pay Laughlin Motors for the automobile. Mr. Steele said he would not let her write a check until he had checked the matter in the office. Mr. Steele later said he wasn't going to give the Laughlin Motors the money."

Later, when plaintiffs sought payment from defendant it declined to pay, perhaps on the theory that when Hanna obtained possession of the automobile in question from plaintiffs the title passed to Hanna. Whatever the reason may have been all this record shows it did was that it did not pay. It is our view that such action does not justify a judgment for punitive damages. There is nothing in this record to indicate that defendant had any ill-will towards plaintiffs or that it was trying to do anything more than protect its financial interests in its dealings with Hanna.

The result is that the judgment of the court based upon the verdict of the jury for plaintiffs on its first cause of action of $1,-

964.91 should be affirmed, and that the judgment based upon the verdict of the jury in the second cause of action of $500 should be set aside.

It is so ordered.

WEDELL, J. (concurring in part and dissenting in part): I concur in the opinion insofar as it sustains the award for actual damages. I, of course, also agree with syllabus ¶ 5 as an abstract statement of law.

I, however, do not agree the statement is sufficiently broad to embrace the facts in this case. In my opinion there was sufficient evidence of an arbitrary and willful disregard to plaintiffs' rights to require submission of the question of punitive damages to the jury. No doubt the defendant had ample provocation to be enraged concerning the conduct of the Hanna Motor Company but that did not justify its arbitrary and willful disregard of plaintiffs' rights.

Nearness of the decision hour prevents a chronological review of all facts disclosing defendant's full knowledge of plaintiffs' rights. One incident alone, however, will suffice to reflect defendant's attitude and willful disregard of plaintiffs' rights which the jury had a right to consider. There was direct evidence defendant's branch manager, Mr. Steele, was informed by Mrs. Craig, the office manager of the Hanna Motor Company, that plaintiffs, automobile dealers, had not been paid for the Mercury car; that plaintiffs were demanding payment and that "they had to pay for it." To this direct information Mrs. Craig said Mr. Steele replied, "to hell with them, he wasn't going to give them the money."

It will be observed Steele did not say he did not believe, or doubted, plaintiffs were entitled to payment but on the contrary clearly disclosed his arbitrary disregard for plaintiffs' rights. The jury had a right to conclude defendant's conduct reflected an attitude to grab everything defendant could lay its hands upon in order to recoup the losses it had sustained in its dealings with the Hanna Motor Company, irrespective of defendant's invasion of the rights of others. Defendant sold the Mercury and retained the proceeds of the sale knowing plaintiffs, automobile dealers, had not received payment for the car. It is generally held, ". . . the intentional doing of a wrongful act with full knowledge of its character, and without cause or excuse, is malicious and warrants an award of exemplary damages." (Rusch v. Phillips Petroleum Co., 163 Kan. 11, Syl. ¶ 5, 180 P. 2d 270.)

Here the defendant knowingly adopted the misconduct of the Hanna Motor Company for its own benefit. A party cannot accept the benefits of wrongful and inexcusable conduct of another and reject its burdens for punitive damages. (*Will v. Hughes,* 172 Kan. 45, 238 P. 2d 478.) See, also, *Motor Equipment Co. v. McLaughlin,* 156 Kan. 258, 133 P. 2d 149, on the general subject of awarding punitive damages for the wrongful and wanton invasion of the rights of others.

The jury was specifically instructed on the subject of punitive damages. Defendant made no objection to the giving of such an instruction or to the character of the instruction given. The instruction, therefore, became the law of the case on that subject and defendant cannot complain that the court instructed thereon. (*Will v. Hughes,* supra, p. 55.) Both the special findings and the general verdict are in harmony with the award for punitive damages. It was the jury's province to determine whether defendant's conduct .was vindictive and malicious. It determined that fact and this court should not disturb its verdict.